IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

DONALD KRAUS, JR.,              )
                               )
          Plaintiff,           )
                               )
     v.                        )   Case No.
                               )   09-3296-CV-S-REL-SSA
MICHAEL J. ASTRUE, Commissioner )
of Social Security,            )
                               )
          Defendant.           )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Donald Kraus, Jr., seeks review of the final
decision of the Commissioner of Social Security denying
plaintiff's application for disability benefits under Titles II
and XVI of the Social Security Act ("the Act"). Plaintiff argues
that the ALJ erred in (1) discounting the opinion of plaintiff's
treating physician, Rick Casey, D.O.; (2) determining plaintiff's
residual functional capacity; (3) finding that plaintiff can
return to his past relevant work as a production worker; and (4)
finding that plaintiff's status post carpal tunnel release is not
a severe impairment. I find that the substantial evidence in the
record as a whole supports the ALJ's finding that plaintiff is
not disabled. Therefore, plaintiff's motion for summary judgment
will be denied and the decision of the Commissioner will be
affirmed.

## I.   BACKGROUND

On April 5, 2005, plaintiff applied for disability benefits alleging that he had been disabled since March 1, 2005. Plaintiff's disability stems from attention deficit disorder, back pain, and wrist pain.  Plaintiff's application was denied initially on June 16, 2005, and upon reconsideration on August 17, 2005.  On March 11, 2008, a hearing was held before an Administrative Law Judge.  On March 17, 2008, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On June 11, 2009, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.   STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the

entire record, considering the evidence in support of and in opposition to the Commissioner's decision. <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951); <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing <u>Steadman v. Securities & Exchange Commission</u>, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." <u>Id</u>.; <u>Clarke v. Bowen</u>, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not

less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.  Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.  Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.  Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.  Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.  Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV. *THE RECORD*

The record consists of the testimony of plaintiff and vocational expert Richard Sherman, in addition to documentary evidence admitted at the hearing.

## A. *ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

**Earnings Statement**

The record establishes that plaintiff earned the following income from 1992 through 2005:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1992 | $ 2,493.72 | 1999 | $13,330.64 |
| 1993 | 3,972.88 | 2000 | 300.00 |
| 1994 | 1,964.32 | 2001 | 5,436.38 |
| 1995 | 1,809.80 | 2002 | 16,484.95 |
| 1996 | 345.00 | 2003 | 7,044.00 |
| 1997 | 0.00 | 2004 | 4,531.66 |
| 1998 | 8,437.74 | 2005 | 2,383.09 |

(Tr. at 51-55, 65-66).

Plaintiff had no reported earnings after 2005 (Tr. at 55, 58).

**Function Report**

In a Function Report dated April 27, 2005, plaintiff reported that he fixes lunch for his children and gets them on the bus, he mows his yard for 45 minutes at a time, he goes out of the house twice a day, he is able to drive and goes out alone, he is able to shop for two hours at a time, he has no problem with personal care, he needs no reminders for personal care or taking medicine, and he has experienced no changes in his ability to cook since his alleged onset of disability, (Tr. at 91-98). He goes fishing once a week and is "good" at it, he watches television, he attends church services once a month. He has no problems getting along with family or friends (Tr. at 96).

When asked to indicate what abilities his conditions affect, he checked memory, completing tasks, and concentration (Tr. at 96). He did not check the following: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair climbing, seeing, understanding, following instructions, using his hands, or getting along with others (Tr. at 96). He indicated that he can follow written instructions "fine" and can pay attention for ten minutes (Tr. at 96). He is

able to handle stress "ok" and can handle changes in routine "good" (Tr. at 97).

**B.    *SUMMARY OF RELEVANT MEDICAL RECORDS***

On October 30, 2004, plaintiff was seen in the emergency room at Olathe Medical Center for cold symptoms (Tr. at 164-165). Plaintiff denied tobacco use.  He was assessed with acute upper respiratory infection and was instruction on over-the-counter treatments for relief.

On February 3, 2005, plaintiff was seen in the emergency room at Olathe Medical Center for chest pain, headache, and dizziness which he had been experiencing for two weeks (Tr. at 162-163).  "The patient is in good medical health and has no chronic medical problems.  The patient does smoke."  Plaintiff was assessed with acute nonspecific chest pain and acute bronchitis.  He as given Zithromax (antibiotic) and Lortab (narcotic) for pain.

March 1, 2005, is plaintiff's alleged onset date.

On March 2, 2005, plaintiff saw Steven Rettinger, M.D., and reported he was better but was still having burning in his chest (Tr. at 176). He was assessed with gastroesophageal reflux disease ("GERD") and chest pain.  He was prescribed Nexium which treats GERD.

7

On March 7, 2005, plaintiff saw Steven Rettinger, M.D, for a recheck of chest pain (Tr. at 175).  He was assessed with gastrointestinal reflux disease.

On March 24, 2005, plaintiff saw Steven Rettinger, M.D., for an evaluation for adult attention deficit - hyperactivity disorder ("ADHD") (Tr. at 174).  The doctor assessed ADHD and prescribed Strattera.

On April 28, 2005, plaintiff saw Dr. Rettinger for a follow up on Strattera and to get patches to help him stop smoking (Tr. at 172).

On May 16, 2005, plaintiff saw Dr. Rettinger and complained of blurred vision (one episode) since beginning Strattera to treat his ADHD (Tr. at 171).  Dr. Rettinger discontinued the Strattera and started plaintiff on Concerta (Tr. at 171).

On May 31, 2005, plaintiff saw Dr. Rettinger and complained of feeling angry after taking Concerta (Tr. at 170).  Dr. Rettinger decreased the dose.

On June 8, 2005, plaintiff underwent a Mental Status Exam, performed by Jason Neufeld, Ph.D., at the request of Disability Determinations (Tr. at 149-152).  Plaintiff listed his allegations as "ADD" or attention deficit disorder.  Dr. Neufeld's report reads in part as follows:

<u>CIRCUMSTANCES AND COMPLAINT</u>
The claimant arrived on time for the evaluation. He
reported that his wife drove him to the evaluation. He
explained that he only drives short distances, because on
longer trips he will "tend to space off." . . .

The claimant reported his complaint with regard to his claim
for disability benefits as Attention-Deficit/Hyperactivity
Disorder (AD/HD). He explained that he first noticed
symptoms of the disorder in elementary school. . .  The
claimant reported that his AD/HD symptomatology has remained
stable over time. He first sought treatment approximately 3
months ago subsequent to being terminated from his last job.
The claimant reported that a "Dr. Redinger" in DeSoto
diagnosed him with the disorder, and that he has been
prescribed medication for the past 3 months. He reported
that his medication continues to be adjusted. He stated
that the current medication regimen causes anger, and that
the one dose he takes at approximately 9:00 a.m. "speeds me
up" and "only lasts two hours." . . .

<u>RELEVANT HISTORY</u>:
The claimant denied any significant medical problems aside
from his reported AD/HD. He acknowledged that he smokes a
half-pack of cigarettes per day. . . .

The claimant reported that he quit school after the 9th
grade because he was "always getting into trouble." . . .

. . . He indicated that his longest term of employment
lasted one year, and that it involved lawn maintenance work
for a city government. His most recent full-time employment
lasted 3 or 4 months, and he was terminated from that
position in March 2005 because of inadequate performance.
The claimant indicated that he has been looking to secure
full-time employment since he was terminated from that job,
but that he has been unable to find work. He reported that
he would begin work immediately if hired. He initially
denied that anything would prevent him from working in a
position such as street maintenance or lawn care. When
questioned specifically if AD/HD would interfere with his
ability to work, he stated that it would only if the
medication were not controlling the symptoms. He then
specifically noted that his current medication regiment
would be problematic because it makes him angry and
irritable.

RECENT/CURRENT FUNCTIONING
The claimant currently lives in a trailer with his wife, 2-year-old son, and 4-year-old step-daughter.  He reported that he is responsible for taking care of both children while his wife works. . . .  The claimant denied any difficulty with typical tasks of self-care (e.g., bathing and dressing).  He reported that he assists in household chores such as washing dishes, as well as cooking the children meals (specifically, breakfast and lunch), giving them bathes [sic], and putting them to bed.  For enjoyment the claimant reported that he . . . will "try to go out and take the kids swimming." . . .

MOOD AND AFFECT:
. . .  On a scale from 1 to 10, with 10 being completely happy and 1 being totally depressed, the claimant rated his recent mood as a 4.  When asked about his rating, he expressed frustration in that "the doctors won't listen to me about medication" and that he "can't get a job to pay bills." . . .

ORIENTATION AND COGNITIVE FUNCTIONING:
. . . He was alert throughout the evaluation, and he did not appear distractible [sic].  Clinical assessment of attention and concentration reveals no gross deficits. . . .  The claimant's memory for incidental, immediate, recent, and remote material was intact based on the range of information he related during the interview. For example, he provided a variety of information when responding to questions about his history. . . .

SUMMARY:
Despite the claimant's reported diagnosis of Attention-Deficit Hyperactivity Disorder, syptoms of the disorder were not readily apparent during the present evaluation. This may be due, in part, to the claimant's current medication regiment.  However, the claimant does appear to be experiencing a significant mood disturbance in the area of depression (e.g., as indicated by depressed mood, diminished interest in enjoyable activities, and appetite/sleep disturbances).  Any existing AD/HD symptomatology, as well as his mood disturbance, would likely have a negative impact on the claimant's occupational performance. Thus, continued psychiatric treatment, as well as the initiation of psychological treatment, to address these issues appears to be warranted.  However, the claimant's reported history,

recent/current functioning, and performance during the
mental status examination indicate that his current
psychological deficits are not such that they would preclude
his ability to perform Simple Unskilled Work. . . .

DIAGNOSES:
Axis I    296.21 Major Depressive Disorder, single Episode,
          Mild
          Attention-Deficit/Hyperactivity Disorder (by
          claimant report)

(Tr. at 149-152).

On June 9, 2005, plaintiff saw Dr. Rettinger and complained

that he continued to have problems with Concerta (treats ADD)

including headache and anger (Tr. at 169).  Dr. Rettinger

prescribed Cymbalta.

On June 14, 2005, Lauren Cohen, Ph.D., completed a

Psychiatric Review Technique finding that plaintiff's mental

impairment is not severe (Tr. at 185-200).  She found that

plaintiff had no restriction of activities of daily living; mild

difficulties in maintaining social functioning; mild difficulties

in maintaining concentration, persistence, or pace; and no

episodes of decompensation.  In support of her findings, Dr.

Cohen wrote in part as follows:  "While the [claimant] reports he

has had difficulties with attention since childhood, he has in

fact worked at SGA [substantial gainful activity] levels in the

past. . . .  He states he follows written instructions fine. . .

.  He does report that he is looking for full-time work but has

been unable to find anything.  He tells Dr. Neufeld that his

attention problems would not interfere [if] the medication controlled his symptoms. . . . The [claimant] does state that his wife works and he [is] essentially caring for their 2 and 4 year old children while she is away. There are no apparent difficulties with self care or routine household chores. . . . The [claimant] does discuss his frustration about being unable to find a job and being unable to find the right medication. . . . Attention, concentration and memory all appeared to be adequate. . . . Dr. Neufeld notes that symptoms of ADHD were not readily apparent although he felt they might in part be controlled by medication. . . . The allegation of ADHD is credible although symptoms appear to be at least in part controlled by medication. He apparently lost a job in March due to a conflict with a supervisor. Activities of daily living do not appear to be significantly limited at this time and the claimant does state that he is actively looking for work. While medication continues to be in the process of being adjusted, current evidence does not suggest that the symptoms he is experiencing are causing more than mild functional limitations. The impairment would therefore be considered to be non severe."

On June 27, 2005, plaintiff saw Steven Rettinger, M.D., for a follow up on Cymbalta (Tr. at 167). Plaintiff reported he was doing well until two days earlier when he became very angry. He

was assessed with ADHD, depression, and fugue state[1] secondary to anger.  He was referred to psychiatry.

On November 23, 2005, plaintiff was seen by Dr. Bharadwaj at Sac-Osage Hospital to establish care (Tr at 237-239).  He said his ADHD needed to be under control, that he slept all day and could not get up and do anything.  Plaintiff continued to smoke a half a pack of cigarettes per day.

On December 8, 2005, plaintiff was seen at Sac-Osage Hospital for a follow up on ADD (Tr. at 235-236).  His doctor noted that all of plaintiff's symptoms were "vague".  Plaintiff was referred to Pathways for "?ADD ?Depression".

On April 11, 2006, plaintiff was seen at Sac-Osage Hospital complaining of right elbow and left wrist pain as a result of a motor vehicle accident (Tr. at 223-226).  X-rays of his elbow and wrist were normal (Tr. at 224-225).  He was given a prescription for Tramadol (an opiate) for pain.

On April 18, 2006, plaintiff's mother called Sac-Osage Hospital and said plaintiff needed an "excuse from work"[2] due to

_____

[1]This diagnosis has a question mark before it.  A fugue state is an altered state of consciousness in which a person may move about purposely and even speak but is not fully aware.  A fugue state is usually a type of complex partial seizure.

[2]There are many other references to plaintiff working after his alleged onset date; however, because there are no reported earnings and credibility is not an issue, I merely point it out.

his legs being swollen (Tr. at 228). The doctor said plaintiff needed to be seen.

On April 21, 2006, plaintiff was seen at Sac-Osage Hospital complaining of swollen feet and ankles, left wrist pain, and right elbow pain (Tr. at 218-221). "Needs excuse for work." He was diagnosed with left hand pain, and he was ordered to get x-rays which were normal (Tr. at 222).

On June 8, 2006, plaintiff was seen at Sac-Osage Hospital complaining of a migraine, sinus problems, and low back pain (Tr. at 216-217). Although plaintiff described his headache as a migraine, he was not experiencing nausea or light sensitivity. He reported a history of "low back pain at times". He was assessed with a sinus infection.

On July 15, 2006, plaintiff was seen in the emergency room at Cedar County Memorial Hospital complaining of a sore on his leg (Tr. at 466-470). He was given an antibiotic and Lorcet (narcotic).

On July 29, 2006, plaintiff was seen in the emergency room at Cedar County Memorial Hospital complaining of pain in his foot (Tr. at 462-465). He was given a prescription for Vicoprofen (narcotic) and told to stay off his foot as much as possible for the next two days.

On August 1, 2006, Ursella Fuller at Pathways called Sac-Osage Hospital Tri-County Clinic and stated that plaintiff had been discontinued at Pathways because he was non-compliant with his appointments (Tr. at 213). He was given one-month's worth of prescriptions for Prozac, Trazodone, and Depakote ER and was told to see his primary care physician for follow up.

On August 2, 2006, plaintiff was seen in the emergency room at Cedar County Memorial Hospital complaining of back pain since the day before (Tr. at 458-461). The records indicate plaintiff was unemployed and was playing cards when his pain began. He was assessed with myofascial strain and was given muscle relaxers and told to keep moving although not to do any heavy lifting.

On August 4, 2006, plaintiff went to Fort Osage Hospital (Tr. at 211-212). He reported right hand numbness from the pinky to the wrist; he said he had gone to the emergency room four days earlier for back pain and his medication was not helping. "Pt [patient] wants paperwork for disability for back pain." Under "treatment plan" someone wrote, "paperwork filled out." Plaintiff's exam was normal, no procedures were done or ordered, no lab work or x-rays were done or ordered, no diagnosis was made, and no prescriptions or referrals were given.

On August 6, 2006, plaintiff was seen in the emergency room at Cedar County Memorial Hospital complaining of numbness from

his right elbow to the pinky finger (Tr. at 454-457). He was assessed with right ulnar neuropathy. He was given a prescription for Prednisone (steroid) and was told to wear a sling for three days.

On August 13, 2006, plaintiff was seen in the emergency room at Cedar County Memorial Hospital complaining of tingling and numbness in his right wrist and forearm (Tr. at 450-453). He indicated the symptoms had been present for the past three weeks. He was given Vicodin (narcotic) and told to see Dr. Reynolds the following day.

On August 14, 2006, plaintiff was seen in the emergency room at Cedar County Memorial Hospital complaining of mild pain and numbness in his arm (Tr. at 446-449). He was assessed with ulnar nerve radiculopathy and was given Tramadol (an opiate).

On October 13, 2006, plaintiff saw Dr. Kubik and reported that his small finger tingling and numbness were no better (Tr. at 208). Dr. Kubik discussed surgery with plaintiff, and he indicated he would like to proceed with that.

On October 23, 2006, plaintiff underwent surgery for right cubital tunnel syndrome[3] performed by Victoria Kubik, M.D. (Tr.

---

[3]Cubital tunnel syndrome is the effect of pressure on the ulnar nerve, one of the main nerves of the hand. It can result in a variety of problems, including pain, swelling, weakness or clumsiness of the hand and tingling or numbness of the ring and small fingers. It also often results in elbow pain on the side of the arm next to the chest.

at 203-204).

On January 2, 2007, plaintiff saw Dr. Casey who noted that plaintiff's depression was not getting better but that his "seizure disorder" was stabilized on his current medication (Tr. at 257, 261). He discussed smoking cessation and prescribed Wellbutrin (antidepressant).

On February 4, 2007, plaintiff was seen in the emergency room at Cedar County Memorial Hospital complaining of having injured his toe (Tr. at 437-441). X-rays were normal. Plaintiff was given Lorcet (narcotic).

On March 3, 2007, plaintiff was seen in the emergency room at Cedar County Memorial Hospital with complaints of left wrist pain (Tr. at 434-436). X-rays were normal. He was given a prescription for Tylenol #3 (narcotic) and told to follow up with his family doctor.

On April 5, 2007, plaintiff saw Barbara Heuser, a physician's assistant in Dr. Casey's office (Tr. at 253). Plaintiff complained of pain in his right hand for the past two to three weeks with radiation into the wrist and right forearm. "States his job involves cutting with a knife repetitively." Ms. Heuser assessed right hand swelling and pain. She applied a three-inch Ace wrap, told plaintiff to take Ibuprofen for a week, and ordered x-rays of his right hand, which were normal (Tr. at

427).  "Note for work - excuse today and tomorrow, discussed change of job duties if symptoms recur or persist."

On April 7, 2007, plaintiff was seen in the emergency room at Cedar County Memorial Hospital with complaints of injuring his hand (Tr. at 423-427).  He was assessed with a right hand contusion and was told to "keep wrapped at work, leave wrap off at home."

On April 20, 2007, plaintiff was seen in the emergency room at Cedar County Memorial Hospital after injuring his right hand "at work" (Tr. at 419-422).  He was given a prescription for Darvocet (narcotic).

On April 23, 2007, plaintiff saw Dr. Casey and complained of pain in his right hand with numbness in the tips of his fingers (Tr. at 249).  Plaintiff had a positive Tinel's sign,[4] and Dr. Casey assessed possible carpal tunnel syndrome in the right hand.

On April 30, 2007, plaintiff saw Dr. Casey (Tr. at 248, 418).  Dr. Casey told plaintiff the x-rays of his right wrist and hand were both normal.  Plaintiff complained of continued significant pain in his wrist. Dr. Casey suspected tendinitis and prescribed prednisone (steroid) for one week.  On May 8, 2007, Dr. Casey refilled plaintiff's Darvocet (narcotic)(Tr. at 248).

---

[4]Tinel's sign is a test that is used by doctors to detect an irritated nerve. Tinel's sign is performed by lightly banging (percussing) over the nerve to elicit a sensation of tingling or "pins and needles" in the distribution of the nerve.

On May 22, 2007, plaintiff was seen in the emergency room at
Cedar County Memorial Hospital after he slipped and fell getting
into the shower (Tr. at 410-413).  His exam was normal except he
exhibited some guarding during his back exam and appeared to be
in mild distress.  He was assessed with acute low back pain and
was given Vicodin (narcotic) and Norflex (a muscle relaxer).  The
medical records indicate that plaintiff was given a "work note"
with instructions not to lift more than 10 pounds, no bending,
and no twisting through May 24, 2007."  He was told to see Dr.
Reynolds or Dr. Casey within two days.

On May 27, 2007, plaintiff was seen in the emergency room
for back pain after he fell (Tr. at 405-409).  X-rays were
normal.  He was assessed with acute myofascial strain and was
given Norco (a narcotic) with instructions to take five every
four hours as needed for pain and was told to come back in four
days for an MRI.

On June 14, 2007, plaintiff saw Dr. Casey and complained of
continuing back pain (Tr. at 246, 247).  Plaintiff was given
steroid injections, a Medrol Dosepack (steroid), and Tylenol 3
(codeine, a narcotic).  On June 19, 2007, he was given a
prescription for hydrocodone (narcotic).  He requested a refill
of hydrocodone two days later, and that request was denied.  On
July 2, 2007, he was given a prescription for Lorcet

(hydrocodone, a narcotic) (Tr. at 246).

On July 9, 2007, plaintiff saw Dr. Casey complaining of continuing back pain (Tr. at 244). Dr. Casey ordered an MRI and prescribed Lorcet (hydrocodone, i.e., narcotic). Plaintiff's hydrocodone was refilled on July 17, 2007. On July 20, 2007, Dr. Casey denied a refill of the hydrocodone because it was too soon. Plaintiff's next request for a refill of hydrocodone was denied on July 23, 2007. On July 26, 2007, he was given a prescription for Tylenol 3 (codeine, a narcotic), Zanaflex (muscle relaxer) and Ibuprofen (non-steroidal anti-inflammatory). Plaintiff's hydrocodone was refilled on August 3, 2007 (Tr. at 244).

On July 12, 2007, plaintiff had an MRI of his lumbar spine (Tr. at 483). Dr. Roger Francis assessed moderate disc degeneration with mild annular bulging a L4-5 and L5-S1 and small central disc protrusion at L4-5.

On July 13, 2007, plaintiff had an MRI of the lumbar spine which showed moderate disc degeneration with mild annular bulging at L4-5 and L5-S1 along with small central disc protrusion at L4-5 (Tr. at 400). "No other abnormality identified."

On August 10, 2007, Dr. Casey denied plaintiff's request for narcotics (Tr. at 279). That same day, plaintiff went to the emergency room at Cedar County Memorial Hospital where he received a prescription for hydrocodone (narcotic) (Tr. at 399).

On August 15, 2007, plaintiff went to the emergency room at Cedar County Memorial Hospital stating that he fell in the shower three weeks ago and was now out of his pain medications (Tr. at 392-395). The treating doctor prescribed Norco (narcotic) and told plaintiff to see Dr. Casey for further follow up on medications. The next day, on August 16, 2007, Dr. Casey denied another request for narcotics (Tr. at 279).

On August 24, 2007, Dr. Casey denied another request for narcotics (Tr. at 279). On August 25, 2007, plaintiff was seen in the emergency room at Cedar County Memorial Hospital for back pain (Tr. at 388-391). He reported that he was scheduled to see a "spine surgeon" on September 5. The treating doctor found left lumbosacral tenderness and prescribed vicodin (narcotic).

On October 4, 2007, plaintiff saw Joyce Heuser, a physician's assistant in Dr. Casey's office, for symptoms of a sinus infection (Tr. at 275). Ms. Heuser observed a red throat and light wheezing, "Exam, otherwise, basically unremarkable." She assessed upper respiratory infection and chronic back pain. Although this record states that plaintiff has an intolerance to Ultram, five days later Dr. Casey called in a prescription for Ultram (narcotic-like pain reliever) (Tr. at 275).

On October 5, 2007, plaintiff was seen by Brian Curtis, M.D., a neurosurgeon, at the request of Dr. Casey (Tr. at 287-

289).  "He has complained of back pain ever since he slipped in
the shower about five months ago. . . .  The patient's pain is
helped with medications and is worsened with laying [sic] flat."
Plaintiff reported smoking 1 1/2 packs of cigarettes per day for
the past 13 years.  Dr. Curtis assessed two level early
degenerative disk disease at L4/L5 and L5/S1.  He recommended
conservative treatment consisting of preventative home exercises,
weight reduction, and non-steroidal anti-inflammatories "rather
than narcotics".

On October 17, 2007, plaintiff continued to smoke a pack of
cigarettes per day (Tr. at 282).

On November 19, 2007, plaintiff saw Dr. Casey (Tr. at 271).
He reported thoracic spasms while lifting a deer.  On exam Dr.
Casey noted no extremity problems.  He prescribed Zanaflex
(muscle relaxer) for ten days.  Two days later, Dr. Casey called
in a prescription for Darvocet (narcotic).

On November 21, 2007, plaintiff was seen by Alan Scarrow,
M.D., at the St. John's Spine Center after having been referred
by Dr. Casey (Tr. at 477-479, 488-490).  He indicated that he was
not a smoker (that he quit three weeks earlier) but that he
chewed tobacco.  His back pain was exacerbated by walking.  He
exercised daily, by walking and doing physical therapy.  On exam,
Dr. Scarrow found that plaintiff had a normal gait and station,

normal straight leg raising bilaterally, normal muscle strength throughout, normal muscle tone in upper and lower extremities, and no palpable tenderness over his sacroiliac joint or cervical vertebra. Dr. Sparrow reviewed plaintiff's MRI. "Deciding what to do for this patient is fairly straightforward in that he has minimal back pain. Given the patient's symptoms, signs and imaging results I believe this patient suffers from mechanical back pain. I have discussed the treatment options which I believe include continued weight loss and exercise. Based on that discussion we are going to proceed with that plan."

On December 21, 2007, plaintiff saw Joyce Heuser, a physician's assistant in Dr. Casey's office (Tr. at 269). His sinus problems were better, his dizziness was "about completely gone", and he had restarted the Prozac which took away his sense of humor and caused him to lose his temper. "The back surgery, tentatively scheduled for this month, was cancelled 'I don't need it right now'."

On February 1, 2008, plaintiff saw Joyce Heuser, a physician's assistant in Dr. Casey's office (Tr. at 264). He reported smoking 1/2 pack of cigarettes per day and not taking his Prozac. He complained of an occasional nonproductive cough. She noted that he ambulated without difficulty and his exam was

basically unremarkable.  She assessed upper respiratory infection.

On February 8, 2008, Dr. Casey completed a Medical Source Statement - Physical (Tr. at 262-263).  He found that plaintiff could frequently lift or carry ten pounds, occasionally lift or carry 15 pounds, stand or walk continuously for two hours and for a total of three hours per day, sit continuously for one hour and for two hours total per day, and indicated that plaintiff's ability to push or pull was limited due to carpel tunnel.  He found that plaintiff could occasionally climb, balance, stoop, kneel, crouch, crawl, reach, handle, or finger, and that plaintiff could frequently feel, see, speak, or hear.  Plaintiff should avoid moderate exposure to hazards and should avoid concentrated exposure to extreme temperatures, weather, wetness, humidity, dust, fumes, vibration, and heights.  The form asks whether plaintiff needs to lie down or recline to alleviate symptoms and Dr. Casey checked, "yes" and indicated such a need would exist every two hours.  The final question is, "Does patient's pain, use of medication, or side effects of medication cause a decrease in concentration, persistence, or pace, or any other limitations?" and Dr. Casey checked, "yes" and wrote "narcotic usage".

On March 3, 2008, Neil Lisenmayer, a chiropractor, completed a Medical Source Statement - Physical (Tr. at 284-285). He found that plaintiff could frequently lift and carry 25 pounds, occasionally lift and carry 50 pounds, stand or walk for three hours at a time and for a total fo seven hours per day, sit continuously for three hours and for a total of four hours per day. He found that plaintiff had an unlimited ability to push or pull. He found that plaintiff could occasionally climb, balance, stoop, kneel, crouch, crawl, reach, handle, finger, and feel. When asked whether plaintiff would need to lie down or recline due to pain, he checked, "unknown." When asked wether plaintiff suffered any decrease in concentration, persistence, or pace, he checked, "unknown."

## C. *SUMMARY OF TESTIMONY*

During the March 11, 2008, hearing, plaintiff testified; and Richard Sherman, a vocational expert, testified at the request of the ALJ.

## 1. Plaintiff's testimony.

At the time of the hearing, plaintiff was 32 years of age and is currently 33 (Tr. at 523). He was married and had a five-year-old child and a seven-year-old step child (Tr. at 523).

Plaintiff went to school through eighth grade (Tr. at 524). At the time of the hearing, he was taking classes to get his GED

(Tr. at 524). He had no difficulty reading or writing (Tr. at 531). Plaintiff testified that he no longer drives because his doctor instructed him not to drive while taking muscle relaxers (Tr. at 524).

Plaintiff's alleged onset date of disability is March 5, 2005, which is the day he was diagnosed with bipolar disorder and his doctor told him he could file for disability (Tr. at 525). Plaintiff testified that he had done no work since 2005 (Tr. at 526).

Plaintiff believes he cannot work because he has attention deficit disorder and his medication makes him go to sleep; because his arm hurts whenever he tries to pick something up; and because he experiences back pain when he sits or stands too long (30-45 minutes) or lifts anything heavy (Tr. at 527-258, 533). Before the surgery on his right arm, plaintiff had problems grasping (Tr. at 532). The surgery helped, and at the time of the hearing he was only having difficulty "picking up heavy stuff", i.e., over 25 pounds (Tr. at 532).

On an average day, plaintiff takes medicine, stretches three times throughout the day, sleeps for four hours, watches television, and reads (Tr. at 528-529). He does not do any cooking or cleaning, does not help with the kids, does not have friends, does not socialize, and has no hobbies (Tr. at 529).

His wife sells Mary Kay cosmetics, and the family lives off of plaintiff's step-daughter's SSI benefits, food stamps, general assistance, and Medicaid (Tr. at 529-530).

**2.    Vocational expert testimony.**

Vocational expert Richard Sherman testified at the request of the Administrative Law Judge.

The first hypothetical involved a person who could sit for six hours; stand and walk for six hours; lift ten pounds frequently and 20 pounds occasionally; should never climb ladders, ropes, or scaffolds but could occasionally climb stairs and ramps; could occasionally balance and stoop; should never kneel, crouch, crawl, be exposed to vibration or hazards; should not perform work with the public but may have incidental contact; may have occasional contact with co-workers; and must not be required to understand, remember, or carry out detailed instructions (Tr. at 535-536).  The vocational expert testified that such a person could perform plaintiff's past relevant work in production (Tr. at 536).

The second hypothetical involved a person with the same non-exertional limitations but who could sit for four hours per day and stand or walk for four hours per day, needing a sit-stand option (Tr. at 536). The vocational expert testified that such a person could perform some production work (Tr. at 536).

The third hypothetical involved a person with the same non-exertional limitations but who could sit for six hours per day and stand or walk for two hours per day, i.e., sedentary work (Tr. at 536). The vocational expert testified that such a person could perform sedentary production work (Tr. at 536). Examples are electronic assembler, D.O.T. 726.685-066 with 2,000 jobs in Missouri and 115,000 in the nation; pharmaceutical packer, D.O.T. 559.687-014, with 1,000 in Missouri and 50,000 in the nation; or optical goods assembler, D.O.T. 713.687-018 with 400 positions in Missouri and 20,000 in the country (Tr. at 536-537).

If the person needed to lie down occasionally (meaning 1/3 of the time), the person would be unemployable (Tr. at 537). The vocational expert's testimony was consistent with the Dictionary of Occupational Titles, supplemented by his training and experience (Tr. at 537).

## V. *FINDINGS OF THE ALJ*

Administrative Law Judge Christine Cooke entered her opinion on March 17, 2008 (Tr. at 14-22). She initially found that plaintiff was insured through December 31, 2008 (Tr. at 14).

Step one. Plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 16).

Step two. Plaintiff has the following severe impairments; degenerative disc disease and bi-polar disorder (Tr. at 16).

28

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 18).

Step four. Plaintiff retains the residual functional capacity to lift and carry ten pounds frequently and 20 pounds occasionally; sit for a total of six hours per day; stand or walk for a total of six hours per day; can only occasionally climb stairs or ramps, balance, or stoop; can never climb ladders, ropes, or scaffolds; kneel; crouch; or crawl; can never be exposed to vibration or hazards such as moving machinery or unprotected heights; should never be expected to understand, remember, or carry out detailed instructions; should have no public contact; and should only occasionally have contact with co-workers (Tr. at 19). With this residual functional capacity, plaintiff can return to his past relevant work as a production worker (Tr. at 22).

## VI.   *OPINION OF TREATING PHYSICIAN RICK CASEY, D.O.*

Plaintiff argues that the ALJ improperly discredited the opinion of Dr. Casey as set out in a Medical Source Statement dated February 8, 2008. In the Medical Source Statement Dr. Casey found that plaintiff could stand or walk continuously for two hours and for a total of three hours per day, sit continuously for one hour and for two hours total per day, needs

to lie down or recline every two hours, and has a decrease in concentration due to narcotic use (Tr. at 262-263).

The ALJ had this to say about Dr. Casey:

> Dr. Casey's opinions regarding the claimant's severity of symptoms is not supported by well documented medical evidence, treatment records or statements of the claimant regarding his daily activities and physical abilities. The assessment is not consistent with the claimant's over-all medical record of treatment which notes improvement with medication and therapy, both physical and mentally. The doctor's opinions are not supported by citation to any clinical or laboratory tests. The undersigned gives little weight to this opinion regarding the claimant's mental and physical limitations, which reflect the claimant's unsupported subjective complaints.

(Tr. at 21-22).

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give to the opinion of the treating physician: (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a

whole, and (6) specialization of the doctor.  20 C.F.R. §
404.1527(d)(2) – (5).

1.  **Length of treatment relationship.** The records of
plaintiff's visits to Dr. Casey span from January 2, 2006,
through February 8, 2008, when he completed the Medical Source
Statement.

2.  **Frequency of examinations.**  Plaintiff saw Dr. Casey
regularly, although plaintiff saw only nurse practitioners in Dr.
Casey's office for the four months prior to the completion of the
Medical Source Statement.

3.  **Nature and extent of treatment relationship.**  Plaintiff
saw Dr. Casey for right hand pain, back pain, and depression,
which were all relevant impairments.

4.  **Supportability by medical signs and laboratory
findings.**  The ALJ correctly pointed out that Dr. Casey's opinion
in the Medical Source Statement is not supported by medical signs
or laboratory findings.  X-rays of plaintiff's right wrist and
hand were normal.  He had a positive Tinel's sign on April 23,
2007; however, no other treatment for carpal tunnel syndrome was
administered by Dr. Casey subsequent to that test.  On October 4,
2007, plaintiff's exam was unremarkable except for redness in his
throat.  On November 1, 2007 -- the last time Dr. Casey saw
plaintiff before the Medical Source Statement was completed in

February 2008 -- plaintiff complained of back spasms while lifting a deer. On exam Dr. Casey observed no extremity problems. Dr. Casey's physician's assistants saw plaintiff on December 21, 2007, and February 1, 2008. During the former visit, plaintiff indicated that he did not need back surgery. During the latter, the physician's assistant observed that plaintiff ambulated without difficulty and his exam was basically unremarkable. There simply is nothing in the medical records of Dr. Casey which could be considered medical signs or laboratory findings supporting the limitations he included in the Medical Source Statement.

Despite plaintiff's having essentially normal physical exams, Dr. Casey's records are replete with examples of drug-seeking behavior on plaintiff's part. Plaintiff routinely went to emergency rooms for treatment and to obtain narcotics, often after he had been denied narcotics by Dr. Casey: He was prescribed narcotics for a sore on his leg on July 15, 2006; for pain in his foot on July 29, 2006; for tingling and numbness in his right wrist on August 13, 2006. He was prescribed an optiate on August 14, 2006, for mild pain in his arm. He was prescribed a narcotic on February 4, 2007, for an injury to his toe and on March 3, 2007, for left wrist pain. He was prescribed a narcotic on April 20, 2007, for an injured right hand just shortly after

he had seen Dr. Casey for this same injury and had not gotten narcotic pain medicine. Plaintiff was given narcotics by Dr. Casey on May 8, 2007, even though the x-rays of plaintiff's wrist were normal.

Plaintiff was given narcotics on May 22, 2007, for back pain; on May 27, 2007, for back pain; on June 14, 2007, by Dr. Casey for back pain; on June 19, 2007, by Dr. Casey for back pain. On June 21, 2007, Dr. Casey denied plaintiff's request for narcotics. He did prescribe narcotics on July 2, 2007; July 9, 2007; and July 17, 2007. Dr. Casey denied requests for narcotics on July 20, 2007, and on July 23, 2007. He prescribed narcotics on July 26, 2007, and on August 3, 2007, then denied a request for narcotics on August 10, 2007. That same day, after his request for narcotics was denied by Dr. Casey, plaintiff went to the emergency room and obtained narcotics. Again on August 15, 2007, plaintiff got narcotics from the emergency room after reporting that he fell in the shower and was out of his medication. Dr. Casey denied a request for narcotics on August 16, 2007, and again on August 24, 2007. Plaintiff obtained narcotics for back pain on August 25, 2007. On October 9, 2007, Dr. Casey prescribed Ultram, a narcotic-like pain reliever. Dr. Casey prescribed narcotics on November 19, 2007.

Plaintiff's drug-seeking behavior does not appear to be consistent with the normal test results and ultra-conservative treatment suggested by his specialists. However, even assuming plaintiff was in such great pain that he would need narcotics to this extent, he did not complain to his doctors about difficulty sitting, standing, or walking. The only physical complaint that appears in the medical records is an increase in pain while lying flat, and this was relayed to Dr. Curtis, a neurosurgeon who saw plaintiff at Dr. Casey's request. Neither did plaintiff ever indicate that lying down or reclining relieved his pain. And no doctor ever suggested such a modality of pain relief.

This factor supports the ALJ's decision to discredit Dr. Casey's Medical Source Statement opinion.

**5. Consistency of the opinion with the record as a whole.** Dr. Casey's opinion in the Medical Source Statement is not consistent with the record as a whole. Plaintiff's right elbow and left wrist x-rays were normal at Sac-Osage Hospital on April 11, 2006. X-rays of his feet, ankle, and left wrist were normal at Sac-Osage Hospital on April 21, 2006. On April 4, 2006, his exam was normal at Ft. Osage Hospital, but plaintiff requested paperwork for disability based on back pain. Toe x-rays were normal at Cedar County Memorial Hospital on February 4, 2007. Left wrist x-rays were normal at Cedar County Memorial Hospital

on March 3, 2007.  Plaintiff had a normal exam at Cedar County Memorial Hospital in May 2007 after hurting his back falling in the shower.  His back x-rays were normal on May 27, 2007.

On July 12, 2007, plaintiff had an MRI of his lumbar spine which showed moderate disc degeneration with mild annular bulging and small central disc protrusion.  On August 25, 2007, the emergency room physician at Cedar County Memorial Hospital found left lumbosacral tenderness.

On October 5, 2007, plaintiff saw Brian Curtis, M.D., a neurosurgeon, who noted that plaintiff's back pain was worse with lying flat.  Dr. Curtis recommended home exercises, weight reduction, and non-steroidal anti-inflammatories instead of narcotics.

On November 21, 2007, plaintiff was seen by Alan Scarrow, M.D., at the St. John's Spine Center after having been referred by Dr. Casey.  Plaintiff said he exercised daily, by walking and doing physical therapy.  On exam, Dr. Scarrow found that plaintiff had a normal gait and station, normal straight leg raising bilaterally, normal muscle strength throughout, normal muscle tone in upper and lower extremities, and no palpable tenderness over his sacroiliac joint or cervical vertebra.  Dr. Sparrow reviewed plaintiff's MRI.  "Deciding what to do for this patient is fairly straightforward in that he has minimal back

pain.  Given the patient's symptoms, signs and imaging results I believe this patient suffers from mechanical back pain.  I have discussed the treatment options which I believe include continued weight loss and exercise."

None of these records from other treating sources support the findings of Dr. Casey in the Medical Source Statement.  This factor supports the ALJ's decision to discredit the opinion of Dr. Casey in his Medical Source Statement.

**6.    Specialization of the doctor.**  Dr. Casey is a family practitioner.  The two specialists who treated plaintiff both recommended weight reduction and exercise, which is clearly inconsistent with any type of physical disability including the need to lie down or recline during the day and the inability to sit, walk, and stand for a full eight-hour work day.

Based on all of the above, I find that the ALJ did not err in failing to give controlling weight to the opinion of Dr. Casey in the Medical Source Statement.  Therefore, plaintiff's motion for summary judgment on this basis will be denied.

## VII. STATUS POST CARPAL TUNNEL RELEASE

Plaintiff argues that the ALJ erred in finding plaintiff's status post carpal tunnel release not a severe impairment.

A severe impairment is an impairment or combination of impairments which significantly limits a claimant's physical or

mental ability to perform basic work activities without regard to age, education, or work experience. 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The regulations, at 20 C.F.R. § 404.1521, define a non-severe impairment.

> (a) Non-severe impairment(s). An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

> (b) Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include--

> > (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

> > (2) Capacities for seeing, hearing, and speaking;

> > (3) Understanding, carrying out, and remembering simple instructions;

> > (4) Use of judgment;

> > (5) Responding appropriately to supervision, co-workers and usual work situations; and

> > (6) Dealing with changes in a routine work setting.

The evidence in the record establishes that plaintiff's ability to perform basic work activities was not limited by his status post carpal tunnel release. Plaintiff's wrist pain began (according to medical records) in the spring of 2006. He had surgery in October 2006 -- clearly less than a twelve-month

period. After surgery plaintiff had no complaints of carpal tunnel pain until April 2007 when he reported a two- to three-week history of right hand, elbow, and wrist pain. By April 30, 2007 plaintiff was given prednisone and thereafter did not have any additional complaints of hand or arm pain. Dr. Casey noted during subsequent examinations that plaintiff had "no significant extremity problems." Dr. Curtis found no evidence of any motor or neurological deficits in plaintiff's extremities during an October 2007 examination. Plaintiff had "no extremity problems" in November 2007. In January 2008, Dr. Casey noted that plaintiff's extremities were "okay with no acute pathology."

In order to establish entitlement to disability benefits, plaintiff must show that he is unable to engage in any substantial gainful activity by reason of a medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 20 C.F.R. §§ 404.1505 and 416.905; Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998); Ingram v. Chater, 107 F.3d 598, 600 (8th Cir. 1997). The record established that plaintiff's carpal tunnel syndrome was never continuously symptomatic for 12 months during the relevant period. Furthermore, plaintiff testified at the administrative hearing that after his wrist surgery, the only difficulty he has had is trying to pick up 25 pounds or more.

Because the ALJ found that plaintiff has residual functional capacity to lift only ten pounds frequently and 20 pounds occasionally, the ALJ's findings are wholly consistent with plaintiff's own testimony.

***VIII. PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY***

Plaintiff argues that the ALJ erred in determining plaintiff's residual functional capacity because the evidence, according to plaintiff, establishes significant restrictions in both sitting and standing due to plaintiff's back impairment. Plaintiff's argument is without merit.

In October 2007, Brian Curtis, M.D., a neurosurgeon, saw plaintiff at the request of Dr. Casey and wrote, "He has complained of back pain ever since he slipped in the shower about five months ago. . . .  The patient's pain is helped with medications and is worsened with laying [sic] flat."  Dr. Curtis recommended conservative treatment consisting of preventative home exercises, weight reduction, and non-steroidal anti-inflammatories "rather than narcotics".

On November 21, 2007, Dr. Alan Scarrow at the St. John's Spine Center saw plaintiff after he was referred by Dr. Casey. Plaintiff said he exercised daily by walking and doing physical therapy.  On exam, Dr. Scarrow found that plaintiff had a normal gait and station, normal straight leg raising bilaterally, normal

muscle strength throughout, normal muscle tone in upper and lower extremities, and no palpable tenderness over his sacroiliac joint or cervical vertebra.  Dr. Sparrow also reviewed plaintiff's MRI. "Deciding what to do for this patient is fairly straightforward in that he has minimal back pain.  Given the patient's symptoms, signs and imaging results I believe this patient suffers from mechanical back pain.  I have discussed the treatment options which I believe include continued weight loss and exercise. Based on that discussion we are going to proceed with that plan."

The following month, plaintiff told Dr. Casey's physician's assistant that he cancelled his back surgery, "tentatively scheduled for this month, [saying] 'I don't need it right now'."

The medical evidence establishes that plaintiff's back pain is worse with lying down, and that his back impairment was not so severe as to keep him from lifting a deer only three and a half months before his administrative hearing.

I find that the substantial evidence in the record as a whole supports the ALJ's finding with respect to the limitations suffered by plaintiff due to his back impairment.

## IX.  *FINDING AT STEP FOUR OF THE SEQUENTIAL ANALYSIS*

Finally, plaintiff argues that the ALJ erred in finding that plaintiff could return to his past relevant work as a production worker because she failed to make explicit findings of the

40

functional demands of plaintiff's past work and compare that with plaintiff's residual functional capacity.

At the administrative hearing, the ALJ obtained testimony from a vocational expert that, based on plaintiff's work history report, plaintiff's past jobs included specific production worker, an unskilled light job with a vocational preparation of two. The vocational expert testified that an individual with plaintiff's residual functional capacity would be able to perform plaintiff's past relevant work as a light production worker. The vocational expert also testified that such a person would be able to perform a range of sedentary production jobs including electronics assembler, pharmaceutical packer, and optical goods assembler.

In her decision, the ALJ cited the testimony of the vocational expert, which described the exertional and skill demands of plaintiff's past work as a production worker -- as he performed it -- as an unskilled, light exertional level. A more detailed description of the demands of plaintiff's past work was not required. Masterson v. Barnhart, 363 F.3d 731, 740 (8th Cir. 2004) ("the ALJ's reference to [Masterson's] past work being 'heavy' work necessarily defined the parameters of the exertional level at which Masterson was working"). See 20 C.F.R. § 404.1566 (ALJ may take judicial notice of job information in the

Dictionary of Occupational Titles and other noted, reliable job information reports when assessing the existence of work in the national economy."); Pfitzner v. Apfel, 169 F.3d 566, 569 (8th Cir. 1999).

Plaintiff cites a job description from the Dictionary of Occupational Titles, 529.686-070, that describes one production worker job as medium exertional level work.  However, as plaintiff acknowledges, the job of production worker is not found individually in the Dictionary of Occupational Titles, as it refers to range of occupations.  The vocational expert cited a number of specific production worker jobs such as electronics assembler, D.O.T. 726.685-066; pharmaceutical packer, D.O.T. 559.687-014; and optical goods assembler, D.O.T. 713.687-018.  These examples of production worker jobs were all sedentary, unskilled jobs.  Plaintiff, who had the residual functional capacity to perform both light and sedentary work, was capable of performing all of these jobs; and the record included the specific D.O.T. job codes for each position.  The ALJ was justified in relying on the vocational expert's testimony, consistent with the Dictionary of Occupational Titles, in finding plaintiff not disabled.  Pfitzner v. Apfel, 169 F.3d at 569; Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir. 1991); Trenary v. Bowen, 898 F.2d 1361, 1365 (8th Cir. 1990).

## VII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 7, 2010